This case number 419-0296 Clarkson v. Walker will show the appellant present by Mr. Stites and Ms. Buttson and the appellee present by Mr. Zachary. You may proceed, counsel, and you have divided your time. Is that correct? Yes. All right, so we have Mr., it looks like it's Stites, not Sites. Mr. Stites going first? No, Ms. Buttson will go first, and then I'll take the second stand. Okay. Please proceed. Thank you. You may please report. Thank you, Madeline. Plaintiffs brought a three-count cause of action to quiet title for trespass and to enjoin future trespass. Trespass motions were filed, and the trial court ultimately granted Defendant Jeffrey and Jacqueline Walker's motion for summary judgment while simultaneously denying Plaintiff William Clarkson's motion for summary judgment. This appeal follows as, in fact, the plaintiff is entitled to summary judgment as a matter of law. Firstly, the plaintiff's predecessor, the Peck family, gained adverse title to the disputed strip and subsequently conveyed the same perspective when he purchased the property in 1976. The Peck family did satisfy all elements of adverse possession in order to gain this adverse title. Firstly, the Peck family held claim to the disputed tract for in excess of 20 years. The plaintiff was a family friend of the Peck family, and starting in 1955, he was on the land, he witnessed how the Peck family used the land, and he later purchased the land in 1976 for a total of 21 years. So he had this continuous access to observing how the Peck family used their land and testified as to the use. Once again, this occurred for in excess of 21 years. Secondly, the Peck's possession was hostile and adverse. The Pecks asserted an ownership that was incompatible with that of the true owner or of others. In particular, the Pecks used the disputed tract to the detriment of the defendant's predecessor, the Van Horms. The offense that encompassed the southern border allowed the Pecks to raise their cattle to that point and prevented the Van Horms from using that particular land to the point of offense. Counsel, let me ask you a question to make sure I understand your position. Are you arguing that ownership of a tract of land asserted due to adverse possession can be conveyed to another party before the adverse possession, the adverse possessor has obtained legal, divisible title to the asset, to the tract? Yes, Your Honor. In particular, that an individual who begins that 20-year time requirement can, at some point, convey that land to a subsequent party and allow that subsequent party, in the case of this particular case, the Pecks can convey the tract. So this ownership can be conveyed before the adverse possessor has obtained legal, divisible title to the tract? In other words, you can convey this before you've gone to court and said, by the way, I own this property pursuant to adverse possession? The property would still be held in adverse claim between the predecessor and the subsequent owner, at which point in time that subsequent owner can apply a title, assuming that they tapped on the full title. But I'm not sure that answers my question directly. Is it your contention that ownership of a tract of land asserted due to adverse possession can be conveyed to another party before the adverse possessor has obtained legal, divisible title to the tract? I don't think the legal title can be conveyed. Go ahead. Well, are you saying that in response to Justice Seidman's question, that the equitable title can be conveyed even though the legal title of the subject property is not spelled out in the deed or the transfer document? You make a very good point, Justice. I think the distinction is the legal versus the equitable. While the legal title clearly can't be conveyed to the subsequent purchaser because the legal title hasn't been accomplished, the equitable title, that beginning phase of the adverse possession, has a legal consequence to the subsequent individual who's attempting to adversely claim the land. In this case, the pets are able to convey the equitable title to the plaintiff, at which point in time the plaintiff can tap on whatever time they felt that subsequent possession to his own time to satisfy all elements of adverse possession. So this notion of tacking on, this concept of tacking on, applies even if the legal title has not been transferred? I think it would have to, given the nature of adverse possession. Adverse possession in and of itself acknowledges the fact that the adverse claimant does not necessarily have legal title until such time that they satisfy all elements, and it becomes important for them to try a title. Are you, in this case, what's happened is the trial court granted, there were cross motions of summary judgment, and the trial court denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment, is that correct? Yes. And you're appealing that denial, or that grant. Simultaneously the grant and the denial. You also purport to be appealing the denial of your motion for summary judgment. Yes. How does that work? What's the basis for that? That's a very good question, Justice. While the filing of two cross motions for summary judgment does establish the fact that both parties are arguing that there does not exist a dispute in fact, and that both sides are entitled to summary judgment as a matter of law, that doesn't necessarily function as a stipulation that no... Just to be clear, as a matter of procedure, as a matter of Supreme Court rules, what permits a party who's lost the motion for summary judgment to appeal the denial? For instance, that's not a final appealable order, is it? No, Your Honor. So I guess going back to your question, we are simultaneously asking the court to overturn the trial court's determination of the grant to the defendant and simultaneously grant our motion for summary judgment. Had the trial court denied both motions for summary judgment, could you appeal that denial? No, Your Honor. Well, then I'm not sure how, because the trial court granted their motion for summary judgment, you can appeal... Assuming we agree with you about the trial court's agreement of granting the motion for summary judgment, how is it appealable for you to be saying, and by the way, we want you to reverse the denial of our motion for summary judgment, and we want that appealed. How does that work? I suppose, Justice, it doesn't. Well, okay. So, Counsel, are you withdrawing that request? We would not be. I would imagine it would be up to the Justice's determination as to the validity of it. Additionally, the pets did have actual possession of the disputed strip. They utilized the fence in order to keep the bamboos off that particular area, allowing their cattle to graze up to that point. Additionally, their use of the strip was open, notorious, and exclusive. The fence line provided a clear discrepancy between what was acknowledged as the property line by both sides. Additionally, that timber management contract with the state gave a financial benefit to the pets to the detriment of the Van Thorns. And finally, the pets' claim of title was inconsistent of that of the approved owner. They viewed significant property as the owners would have, inconsistent with the Van Thorns' claim. As such, the pets were able to satisfy all elements of adverse possession. They gained title adversely to this disputed tract, and when the plaintiff purchased the tract in 1976, he purchased all of the pet land in Mason County, and thus this disputed tract was included within that purchase. It was rightfully conveyed to him. In the alternative, the plaintiff also adversely gained title by tacking on the pets' time in possession. The plaintiff purchased the property in 1976, and the defendants purchased the Walker property in 1995 for 19 years. As such, the plaintiff is able to, in using the land the same way that the pets did, except the cattle industry had since left the state, and the plaintiff began to expand, and he's able to satisfy all elements of adverse possession, and the plaintiff is entitled to some regulation. Thank you, counsel. Mr. Stites? Thank you. If I may, I'd like to go back and respond to some of the questions that I think arose in this portion. Mr. Steinman, your question, I think, was, well, if you went forth and declared that there had been adverse possession. I'd like to start with that fundamental issue. Adverse possession, at least to my understanding, is a time-based status. In other words, let's say that I have someone that has possessed for 20 years, and they'll dispute about that. It never goes to court. It never asks for a finding that I'm adversely possessed, and the title holds. That person is still adversely possessed, and can pass whatever it is that they have to the next person. So they have now obtained a valid title to the property due to the adverse possession, which can, in turn, now be conveyed to a buyer. That is true. Even though no court has, under my scenario, made a determination that this adverse possession is, in fact, a legitimate basis for a title claim. That's correct. Is there any case that is so held? Yes, I apologize to the court, I don't have it before me at this moment. But I believe that there is, and that the, I know, I remember specifically discussing this at the trial court level. And the issue, basically, was very similar to what you have just asked, but it is a, there's a time-based basis for possession. Now, let's say that we do have a situation where we have, I've just laid out as an example, and we have a person who has held for 20 years, and passes a quick claim deed, that's one way to do it. If, you know, there's some outstanding possession. The other one is a warranty deed. And if a warranty deed is given, and the warranty turns out to have not been appropriate, then, obviously, there's a cause of action vis-a-vis the previous holder. But there wouldn't be on a quick claim deed, would there? No, no, a quick claim deed, on a quick claim deed... You get whatever you get. You get whatever you get. No, no, let's still have to describe what you are purportedly conveying, don't you? Sure. How would anyone know to check the reporter's office? What was conveyed? It's not legally described in the quick claim deed or the warranty deed, so... I understand your question. So, again, we'll go back to the example. Whoever this predecessor person was, they got their title, okay? And they had, at least in theory, a described piece, either by a surveyor going out or... In some fashion, they have defined an area. Of course, a lot of these cases where it is the kid's head or his possession is denied is because there was not a definable space that could be put down. But they have a space. They put it out to the next deed, okay? And that's what it is it passes. Now, can it be over-inclusive or under-inclusive? Yes, it could. So, for instance, let's say it was over-inclusive. Then, obviously, that successor person would not get that over-inclusive strip or whatever it is that the predecessor had not possessed for the 20 years or if there was some other fault with the adverse possession elements. That would not pass because it didn't satisfy. But if, as is frequently the case and is the case here, we're passing pursuant to offense, described, surveyed. None of that's in the deed, though. That's a problem, isn't it? That's true, although I know of no situation where you cannot convey everything that it is that I own in this case against the county, which is basically what happened. It could be all of Macon County, then, if you don't have any description. I'm sure Mr. Clarkson would like that, but I don't think that's his claim. I think his claim is that the PECS possessed this area, meets all the requirements of adverse possession, and to the extent that he would claim all of Macon County, he shouldn't be taking the task for that because that is clearly beyond that which the offenders have possessed. Now, I would point out that one of our arguments is that while all of these questions are, of course, relevant, nonetheless, it is the case that there was a 20-year period prior to that and the PECS did possess that for that period of time, so there really isn't this situation where the PECS need anything associated with tacking. The argument with tacking nearly came along because we're looking at it two different ways. One is the PECS already had it and passed it. The other one is that Mr. Clarkson had it for 19, but he's tacking on one year, so there's two ways to look at it. Just a second. I think you raised the issue with respect to final appeal of order and the two issues that we have here, so Mr. Zachary admirably prosecuted his case and convinced the judge that it was a case that he should have self-rejection. Concurrently, ours was denied. So, in terms of Supreme Court rules, that would be, at that point, a final appeal of order. Otherwise, you would never get to a situation where anything could be concluded. Well, no, the motion for summary judgment is not a final appeal of order. In and of itself. Where Judge Little concluded the case by coming to the conclusion that there was summary judgment appropriate for Mr. Zachary's client, but not for Mr. Clarkson. The issue before us is, was the trial court correct with regard to the defendant's grant? Right. But a grant of a summary judgment as a final appeal of order, a denial is not. So, I don't understand how the fact that it was granted for the defense makes what is otherwise a non-final appeal of order, final appeal. So, under your Honor's view of it, you would have one that has been granted, okay? Now we have the one that is not granted still standing out there. The suggestion of the court would seem to be that in order to get to a point of a final appeal of order, that case of Mr. Clarkson would have to be tried. No, go back and, you're talking to people who have been trial judges, okay? I've denied motions for summary judgment, and the next thing I know, here is a motion with a new 191B affidavit, which is, okay, well, now you've crossed the threshold of my judgment. I'm going to grant it. That's why the first time my denial wasn't a final appeal of order, the second time was, when I granted it. But that's only if I win. Well, that's only, but actually, yes, that's an excellent point. Only if you win a motion for summary judgment is it ever a final appeal of order. I don't understand how a denial could ever be. Okay, and I appreciate that. But I understand what you're saying, and what I'm suggesting to the court is, as long as he has been granted summary judgment, in other words, he's won on the merits at this point, the judge has said, no, you're wrong, there's not a basis for summary judgment as to you, and necessarily, if I grant this, then I am essentially saying there's no basis for you. You can't both be the owners here. Well, I understand both of you are arguing, we've seen this before, you're contending that there's no genuine issue of material fact, and each is entitled to a motion of summary judgment, but it's also long-time case law that neither the trial court nor this court is bound to accept those positions of the parties. And I understand that all I can do is argue in favor of the proposition I have at the moment, but I am suggesting that that would mean I have nowhere to go at that point. Back to the trial court. Here's a new motion for summary judgment addressing matters which apparently the trial court found not adequate. Or maybe the trial court thinks if we were to reverse, no one should be entitled to it because there are genuine issues of material fact here. If I am permitted in the trial court to say nothing more than what I've said, which we put our best argument for to Judge Little, and he found that that was not adequate. That's the point at which I think I've run out of things to say, unless I make them up. That's why God invented jury trials. Take it to the jury, let them resolve it all. No, but I already know that there's a judgment that precludes the ability of the jury to find the counter. That's at least the dilemma. Thank you, counsel. Mr. Zachary. Thank you, Your Honor. Good morning. I am James Zachary. This is from the ability of Zachary to be here. I represent Jacqueline and Jeffrey Walker, who are the legal title owners of this disputed tract. I want to point out, and I'm sure you know this, that we're talking about 2.14 acres of wild, unimproved woodland. There are trees, briars, copper birch, whatever, but that's what we're talking about, and that's important as we get down to the analysis of this case. I first want to address the argument made by my opponents that somehow the Supreme Court case of McIlroy v. Force has eliminated the presumption that my clients expected to enjoy. The law in Antler's possession is and has been that the title is entitled to every presumption. It's a very strong presumption, and it's part of the Antler's claim to prove each and every element by clear and convincing evidence. McIlroy v. Force involved the presumption that arises when there's a motor vehicle accident and everybody's killed, nobody knows who was driving, but the owner was one of the occupants, and therefore it's presumed that the owner was the driver. That's an elementary presumption. I'm very familiar with that because it was involved with a case we had last year, but the evidentiary presumption does not change the burden of proof. It merely provides something that can be used to determine whether the burden of proof was omitted in the absence of other evidence. And they dealt with if other evidence is introduced, then that presumption disappears and the case goes on. But adverse possession, again, establishes the burden of proof by clear and convincing evidence, and I can't imagine that the Supreme Court is intending to overturn the longstanding, well-established law of adverse possession through this McIlroy v. Force case. And it's important in this case because if we have no presumptions, we're in trouble. Because, as Mr. Stites has argued, my clients haven't really presented it yet. And so that's not surprising. We're not sure when this fence was built, but I don't think it'll even slide when it's built. And the fence is, of course, the key to this case. If there were no fence, there wouldn't be a dispute. So, I'd like the Court to take a look on page 6 of the Pell Lines Brief. It's in the Discoveries Unit. Mr. Zachary, can I interrupt you? At the beginning of your argument, you mentioned the condition of the land, that it's wild and vacant, and you said that was important. And I'm assuming you're saying that's important because, as you went on to discuss, presumptions. If we disagree with you, if we were to find that the land is not wild, unimproved, do you lose? Well, that would eliminate the presumption that it applies to wild, unimproved land. I don't know whether you got good photographs or not, but the record we got has three productions or photographs that were taken all over this place. And even from those bad reproductions, you can tell that there's a bunch of trees and bushes, and that's it. There's no roads, no driveways, no buildings, just wood. The construction of the fence, was that an improvement? I suppose. Of course, we don't know much about that. And the location of the fence, I think, is very important because if you look at that file on page 6, you see a nice east-west line delineating the Peck, now Clarkson, and Van Horn, now Walker Park. Until you get to this point where the fence line jogs down southwest, and then northwest and south, there's a boundary. Why would that fence be here? We have evidence in the record that the logical reason it was put in was to keep cattle from getting out of the river line. But we don't know who put it in, and we don't know when it was put in, and we don't know the circumstances under which it was put in. All we know is a fence is put up at one point in time and puts cattle raised on the land. Since it is wild enough to do it, it's our position that there's a presumption that that type of use would be permissive. It would be to Van Horn's advantage not to have the cattle get down into the river bottom and foul it up. It's to Peck's advantage to keep their cattle out of the river bottom, and they can raise there. It doesn't make any difference. So our position is that the fence itself is a permissive use, as it's presumed to be, and there's no evidence to contrast. I would point out, and I understand there's some dispute about this, but my client, Mr. Walker, prepared an affidavit in which he related a conversation with Ruth Van Horn from when we bought the property, when we were touring the property. She said some things about camping that I don't care here, so it shouldn't be, but what she did say was, a fence was built to keep the cattle out, but the property line is off to the north, which I thought would be hearsay until Mr. Spice educated people to evidentiary rules of evidence that allow a hearsay statement about the location of the property line, and that's how he got his statement from the other Van Horn that it was the fence. In any event, that makes sense. The place where the fence exists is a higher elevation than prior to the north, and that's important because, again, this is a river lot, a river flood. When the river floods, trees come flowing down, brush, debris, all kinds of stuff, and if that hits the fence, it damages it and or destroys it, so the fence was built at an area where it would be less likely to get damaged by the river flood, and that's in Mr. Clarkson's testimony. So our position is that it was presumed, the fence was presumed to be permissive. There's no evidence to dispute that, and it's a permissive use. We never write anything in this position. What about the timber harvesting? Well, I have a couple of points on that. Number one, supposedly it was pursuant to a contract. We've never seen a contract. Number two, it's basically vague testimony that some timber was harvested, but we don't know what or where. It's not clear if it was, and on top of that, when you look at the fence use prior to that, they used the cattle because they didn't do anything else. They didn't build any structures or anything. They just let the cattle eat the wild fauna, flora. Yeah, flora, not fauna. Counsel, you mentioned that plaintiff purchased the property on a contract for deed. That's correct. And the contract for deed was at least purportedly subject to a timber contract, right? I believe it was. But you have not, they didn't supply the timber contract, is that right? And was there also a subsequent contract that plaintiff entered into with the state of Illinois? Supposedly, there's parts in there that entered into a contract too, but I don't think I've ever seen that either. Neither one of those purported timber contracts are in the record, as I understand it. The contracts themselves are not. And I would argue that Mr. Clarkson's recitation of what the contract said is his. Would there be a way to find these contracts in the recorder's office? I don't know. We requested a deposition at least for that contract. Whose responsibility would it be to produce these contracts, because they appear to me to be relevant evidence? I would think it would be the person who's relying on them. It would be what? I would think the person who's relying on them. And when you get to Mr. Clarkson's use, it's virtually non-existent. He testified that every other year or so he would walk the property. He may have torn down some deer stands. He may have put up some signs. Now, when he first filed his prior, he bulldozed some trails. But the Willowville versus Alvarez case is right on the point. That type of use is not sufficient to constitute actual use. In fact, his use of this property was so inconsistent and insignificant that it took 15 years for anybody to determine that there might be a dispute here, despite the fact that Mr. Walker and his group were erecting tree stands every year. They built this bridge across the creek. They ran their four-wheelers. They were using the property on a regular basis. So the testimony is that the one party is building deer stands, and the other party is tearing them down. Not Walker's. No? Walker's would never do that. In fact, there's pictures of the remnants. Some of them are still up. They were built back in 1925. Plaintiff did not testify that he was tearing down deer stands and making sure the trespassers weren't. No, he didn't tear down deer stands, but he never said he tore down any stands that Walker put up. The evidence is clear that he did not. There are pictures of stands that were built back in the fall of 1995 when Walker's acquired the property, and you can still see where they were. Again, his use was casual, inconsistent, and insignificant. So he really didn't have actual possession. And certainly, he personally has not had any years of possession. And so basically, your position is the Pecks didn't have adverse possession to pass on. They didn't possess the property by adverse possession and convey it to the defendant. And the defendant alone has not adversely possessed the property, and so there's nothing to tack on. Well, the defendant, we're not claiming the adverse possession of the property. If I misunderstood you, I... No, I'm sorry. What I'm saying is, you're saying that Walker did not have adverse possession. Walker has a legal title. He bought the land. He had it surveyed and knew what he was buying and paid for it. And that gets to another problem here. Mr. Clarkson, he's a highly educated, owns 2,000 acres of land in the business, bought unapproved wild river bottom land on a meets and bounds description without getting a survey. Now, had he gotten one, he would have realized that this strip isn't in what I'm buying. I don't think the law requires him to get a survey, and I don't think caveat F, George, is the law, but it's still good advice. He didn't pay a penny for this land. My clients did their due diligence. They did a survey. They determined what they were getting, and they paid for it. Now he wants the court to come up with some adverse possession theory that doesn't hold water. And I'm not going to relate this. Maybe I'm being obtuse about this, and if I am, I'm sorry, but I read that complaint, and I don't see anything that tells me clearly that he's claiming that Peck had adverse possession. I don't see anything in his motion for summary judgment where he claims that Peck had adverse possession. I don't see the word Pecking brought up until a motion after the cross-motion from summary judgment was allowed. And this has been like shooting a moving target. I didn't start the case. When I got into it, I looked at it, and it looked like everything was concentrating on Clarkson's activities and clearly me, he didn't get adverse possession. Well, maybe Peck's got adverse possession, so we shot some holes in that. Well, we had the one-year timber contract, and so, you know, if I could knock one down, that would cost another one. I don't think that... And I'm sorry, I misspoke a few moments ago, Mr. Zachary. So basically you're saying that Clarkson didn't adversely possess the property, neither did the Pecks, and so under either of their assertions as far as ways that Clarkson owns this property, it doesn't work. That's our position, and I think it's amply borne out in the evidence, particularly when the clear and convincing evidence rules are applied to the various elements of adverse possession. His evidence largely consists of his belief based on conclusions with a badge of heresy throughout the entire case. And so tacking was only discussed when? At the trial court level? It was not discussed actually until a motion to reconsider the motion for summary judgment. Nor was it argued. And it's never been fled, in my opinion. Do you have any other questions? I don't see any at this time, thank you. Any rebuttal? Yes, there is a rebuttal. If I could address some of the motions that came up. Your Honor indicated a question about if the court were to find that it was not while the non-inclusive law, and in particular asked a question about the fencing. And I think maybe the court was referring to the sirens in Frankenweiter, probably butchered both names. Case, and basically what that case held was that fence can be removed. So, and we cite that in our brief. But the reality of it was that it was occupied in the sense that if you're going to travel on that land and you're doing the activities associated with doing that, then you are occupying it, you are using it. Could have been by permission, couldn't it have been? There's no evidence of it, I'll say that. When you ask it that way, the way you've asked it, could it have been by permission? Certainly. Well, that wouldn't be uncommon for one person to allow another person to graze their cattle on part of their property. If it's just wild ground, wild vacant land, it's interesting. I guess what I would say is, I disagree with the end conclusion about wild. It was fenced, and that in some way or another seems to be adequate. And so your position is that it's not wild? That would be correct, yes. Because it was occupied, it was not vacant. If you take a look at the... Well, just to follow up on that, so you're saying that there's no presumption. Right. But isn't it, when you're trying to make a claim under adverse possession, isn't it the case that you have to satisfy all the elements by clear and unequivocal evidence anyway? So my question is, what difference does the presumption make? I think it was alluded to in Mr. Thacker's argument. The reality of the situation is, and this is no fault of Mr. Thacker's or his client's, he was not around at the time. He has no evidence other than this alleged presumption. We have all the evidence, because Mr. Thacker grew up as a kid. And he knows exactly what happened at the right time and testified to it. So when we talk about issues of presumption and the like, the nature of the property, according to the case of William and I, it tells you that if you use it in a defensive, you are occupying and using, and it is hostile in nature. You ask whether it's a case that could be permissive. Sure. But there's no evidence of that. All sorts of things could have happened, but there's no evidence. Well, before you run out of time, tell me about these contracts that are alleged, but they're not in the record. Why would that be? I don't understand. Well, Jim, Mr. Zachary has indicated that it was asked in the requisition. He and I are both inheritors of the work of others. I will be honest and say I have no recollection after having read Mr. Clarkson's requisition. He's asked for a requisition. I wouldn't provide it. I know it was not requested in any request of permissive or anything of that nature. It wasn't produced because it was never asked for, in my view. Now, if I'm wrong and I miss it, I apologize to Mr. Zachary, but I don't believe that that's the case, and it is Mr. Clarkson's requisition. He's asked for a requisition. So if I'm wrong, I'm wrong. But I will say that it was never an issue in terms of a request, either at deposition or by paper, and then a motion to enforce the request. But do you agree that you relied upon that heavily, that timber contract and that activity taking place on the property? I would agree that it is one of, Gilbert's Table has a lot of points that we relied on. Yes. As far as the other issues, I'm sorry, Mr. Zachary, we don't know how much, and we don't know when. The fact that somebody is going and searching to the state of Illinois, which, by the way, in answer to your question, it is filed, and it is required to be filed in the Macon County. What's filed? The contract. The contract for deed? Yes. And when you say filed, you mean recorded? I don't think it's recorded. I think it is only required with the county court. It's in our brief, I know that, that we address that topic. I have one final question. Is there a jury demand in this case? So if it goes back, is there going to be a jury trial, or is it a bench trial? Okay. Mr. Zachary does not believe so. Does not believe what? To be honest, I can't tell you. Does not believe so. Does not believe what? Does not believe that there is a jury demand. I confess that I don't know. Okay. There could be a question whether you're even entitled to a jury trial on a statutory claim such as this. Anyway, thank you. We'll be in recess to take this matter under advisement. Thank you, counsel.